22549

In the Matter of Randall Dean AMICK, Respondent.

(343 S. E. (2d) 623)

Supreme Court

*Randall Dean Amick*, Lexington, *pro se*.

*T. Travis Medlock, Atty. Gen.*, and *Richard B. Kale, Jr., Sr. Asst. Atty. Gen.*, Columbia, *for complainant*.

Heard Feb. 11, 1986.

Decided May 12, 1986.

*Per Curiam:*

This is a disciplinary action. Respondent, Randall D. Amick, is charged with disciplinary violations in five separate matters as set out below. The Hearing Panel found him guilty in two instances (the Lyles matter and failure to cooperate with the Board's investigation) and recommended a public reprimand. The Executive Committee unanimously disagreed with the Panel and found him guilty in all of the matters charged. The Committee recommended an indefinite suspension. We agree with the findings of the Executive Committee and independently find that the appropriate sanction is indefinite suspension.

### The Lyles Matter

Betty S. Lyles retained Amick in 1978 to represent her in a personal injury action against the United States Postal Service. Amick neglected to file an action within six (6) months of the Postal Service's denial of Ms. Lyles claim, resulting in the claim being barred under federal law. Thus, Amick neglected a legal matter entrusted to him in violation of DR 6-101(A)(3) and intentionally failed to carry out a contract of employment in violation of DR 7-101(A)(2).

Amick compounded his neglect by misrepresenting to his client for almost five (5) years that her case was pending in Federal District Court and that the case had not reached trial because of a backlog of cases. In January of 1984, Ms. Lyles filed a complaint with the Board of Grievances. Amick subsequently filed in the Court of Common Pleas an action which was removed to the United States District Court. In a proposed order of dismissal, Amick misrepresented to the District Court that the matter had been settled "by agree-

ment of the parties." The judge signed the order of dismissal, but subsequently rescinded the order after the true facts were ascertained at a hearing on the matter. As a result, Amick has engaged in conduct involving dishonesty, fraud, deceit, and misrepresentation in violation of DR 1-102(A)(4), and has knowingly made a false statement of fact in violation of DR 7-102 (A)(5).

After representing to Ms. Lyles that the case had been settled, Amick paid her from trust account funds and had her sign a statement that she was satisfied with his representation, and that she wanted to discontinue the grievance action against him. Amick admitted that the statement was intended to release him from liability. We find Amick's attempt to exonerate himself from his malpractice is in violation of DR 6-102(A). *See Matter of Clarke,* 278 S. C. 627, 300 S. E. (2d) 595 (1983).

Amick is also in violation of DR 7-102(A)(2) by filing the case in the Court of Common Pleas, because he knowingly advanced a claim that was not supported under existing law and could not be supported by a good faith argument. Amick's total representation of Ms. Lyles was prejudicial to the administration of justice in violation of DR 1-102(A)(5) and adversely reflected on his fitness to practice law in violation of DR 1-102(A)(6).

### The Gulledge Matter

Amick was employed by Mr. and Mrs. Gulledge to prepare a separation agreement. He advised both parties as to the terms of the agreement. Thereafter, Amick represented Mrs. Gulledge in a divorce action against Mr. Gulledge. The divorce action also involved matters contained in the separation agreement which were contested by Mr. Gulledge. Amick should not have represented Mrs. Gulledge because of his previous representation of both Mr. and Mrs. Gulledge and because his independent professional judgment may have been impaired.

Amick breached DR 5-105(A) and (B) and DR 5-101(B).

### The Rose Hutto-Morris Matter

Amick was retained by Ms. Hutto-Morris to represent her

as a result of an auto accident on October 11, 1979. After investigation, it was determined that the other vehicle in the accident was uninsured and, therefore, a claim was made against Ms. Hutto-Morris' own policy. This claim was settled for $13,500.00. Ms. Hutto-Morris' medical expenses had been paid under an employee group insurance policy.

On December 18, 1979, the insurance proceeds were disbursed. Amick advised Ms. Hutto-Morris that she should maintain about $7,000.00 in his trust account in the event the employee group carrier sought reimbursement.

During the period between 1979 and 1984 Amick failed to maintain a sufficient balance in his trust account to cover the amount due Ms. Morris. His partner was partly responsible for the insufficiency of the trust account. In addition Amick withdrew $1,500 as attorney's fees from the trust account.

Amick did not disburse the remaining proceeds to Ms. Morris until 1984 when she filed a grievance complaint against him. There is no evidence that the insurance company intended to assert a subrogation claim for the medicals paid and there is no reason Ms. Morris could not retain the funds herself. Amick was acting in his own selfish interest and violated DR 6-101(A)(3) and DR 9-102.

## The Client's Trust Funds

Amick is charged with commingling his personal funds with his client's trust funds; failure to keep proper records; misappropriation of client funds; and failure to maintain his client's funds in his trust account.

Amick stipulated to the personal nature of the checks which he had issued on his trust account. He contends, however, that he had accumulated his fees over years in his trust account, and that the checks were paid out of his own funds in the trust account. By his own testimony, Amick is guilty of commingling his personal funds with his client's funds in violation of DR 9-102(A). In addition, the record establishes that Amick failed to maintain complete records of all funds in his trust account, and he failed to render appropriate accountings regarding the funds in violation of DR 9-102(A) and (B)(3).

*Failure to Cooperate with the Board's Investigation*

The record reveals Amick failed to cooperate with the Board's investigation by not responding to the complaints in the Lyles and Morris matters.

*Conclusion*

We concur with the findings of the Executive Committee. While there were varying sentiments as to the proper sanction, the majority of this Court concludes that the appropriate sanction is indefinite suspension.

It is therefore ordered that respondent be indefinitely suspended from the practice of law in this State. He shall within 10 days surrender to the Clerk of the South Carolina Supreme Court the certificate admitting him to practice, and shall comply with all applicable rules of the Court.

NESS, C. J., dissenting in separate opinion.

NESS, Chief Justice (dissenting):

I dissent. I believe disbarment is the appropriate sanction.

I do not disagree with the majority's rendition of the facts. Rather, my disagreement is with the majority's conclusion that respondent's conduct is not so serious as to warrant permanent expulsion from the Bar. Apparently, the majority believes respondent may someday rehabilitate himself sufficiently to justify his readmission to the Bar. This conclusion simply cannot logically be drawn in the face of a pattern of conduct which reflects an inherent lack of understanding of the duties and the responsibilities of a lawyer.

By admitting a lawyer to the practice of law, this Court impliedly certifies to the public that the lawyer possesses the necessary legal knowledge to practice in the courts of the State. Rule 2, Rules for the Examination and Admission of Persons to Practice Law in South Carolina. A suspended attorney may be readmitted to practice only upon a showing of proof of professional competence and learning in law. Rule 38(A), Rules on Disciplinary Procedure. Indefinite suspension would be appropriate when the Court believes respondent may, in the future, be able to demonstrate the required competence. Where, as here, a lawyer's conduct

reflects that rehabilitation in professional competence cannot be achieved, disbarment is appropriate.

The image of the Bar is based in part upon the manner in which the Court disciplines lawyers who have been, as found by the majority, "... engaged in conduct involving dishonesty, fraud, deceit, and misrepresentation." The possibility, however remote, that a lawyer who has engaged in such conduct will someday be readmitted to practice cannot help but tarnish the image of the Bar and this Court.

I would disbar.